**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**MARK JOHNSON**                                                                          **PLAINTIFF**

**v.**                                                               **No. 4:21-cv-00120-MPM-DAS**

**CLARKSDALE PUBLIC UTILITIES
COMMISSION, GEORGE MILLER, SR., and
DONALD MITCHELL**                                                          **DEFENDANTS**

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff Mark Johnson (Plaintiff's Motion for Partial Summary Judgment) [125] and Defendants Clarksdale Public Utilities Commission ("CPUC"), George Miller, Sr.[1], and Donald Mitchell (Defendants' Motion for Summary Judgment) [127] pursuant to Fed. R. Civ. P. 56. Both Motions have been fully briefed. The Court has reviewed the parties' submissions, the evidentiary record, and applicable law and is prepared to rule.

**I.     RELEVANT BACKGROUND**

Clarksdale Public Utilities ("CPU") is a municipally owned utility governed by a five-member Board of Commissioners ("CPUC" or the "Board"), including Defendants Mr. Miller and Mr. Mitchell at the relevant time. Mr. Johnson was hired as General Manager in June 2017 and served until his termination in September 2018.

The events leading to Mr. Johnson's termination began in May 2018, when the Board discovered that CPU telephone lines had been recorded without its approval. The purchase of the

---

[1] Defendants filed a suggestion of death for Mr. Miller on May 20, 2025. [123]. To date, Mr. Johnson has not moved to substitute a proper party pursuant to Fed. R. Civ. P. 25(a). Ordinarily, Rule 25(a) would require dismissal of the action as to Mr. Miller after 90 days if no substitution motion is filed. However, the Court resolves all claims on summary judgment, rendering the issue of substitution moot, and no separate dismissal under Rule 25(a) is necessary.

recording system exceeded the statutory bidding threshold, and CPU's attorney warned that the recordings could implicate federal law. CPUC referred the matter to the FBI and retained independent investigator Jim Herring. The investigation indicated that Mr. Johnson had authorized or permitted the purchase on behalf of CPUC and knew or should have known that all lines were being recorded. The record also reflects attempts by Mr. Johnson to influence the investigation by soliciting false allegations against a commissioner.

On July 25, 2018, the Board unanimously suspended Mr. Johnson, CFO Steve Reed, and Communications Director Chris Campos with pay. While suspended, Mr. Johnson criticized CPUC, publicly called for the removal of the commissioners, and contacted the State Auditor and the press. The City of Clarksdale (the "City") then ordered CPUC to halt meetings concerning the suspended employees and directed CPUC to appear before Mayor Chuck Espy (the "Mayor") and the City Board. [144], Ex. 7. CPUC subsequently filed a separate federal action against the City alleging interference with its personnel authority and ongoing investigation. The case settled the next day, with the Mayor acknowledging the City's obligation to review Mr. Johnson's allegations but characterizing them as "a lot of smoke, but no real fire." [127] Ex. 27 at 1. Following the settlement and completion of Mr. Herring's investigation, the Board voted three to one, with one abstention, to terminate Mr. Johnson on September 25, 2018.

Mr. Johnson alleges that CPUC suspended and terminated him in retaliation for his speech and for whistleblowing. He points to references in his termination notice that describe his reporting activity as "insubordination," [127] Ex. 36 at 1, and to findings from an unemployment compensation hearing that there was insufficient evidence of misconduct on his part. [144] Ex. 11 at 324. Mr. Johnson brings claims under the First Amendment, pursuant to 42 U.S.C. § 1983, and

the Mississippi Whistleblower Protection Act ("MWPA"), Miss. Code Ann. § 25-9-173. He also seeks partial summary judgment on Defendants' affirmative defenses raised in their Answer [46].

Defendants contend that Mr. Johnson was terminated for legitimate, non-retaliatory reasons tied to his own conduct and the actions of subordinate employees for whom he was ultimately responsible. These reasons include: (1) his role in authorizing the illegal telephone recording system and failing to notify CPU employees the lines were being recorded; (2) approving improper purchases in violation of state laws and CPU policy; (3) attempting to manipulate the investigation by pressuring a subordinate employee to make false sexual accusations; and (4) disrupting CPU operations by involving the City in efforts to remove the entire CPU Board of commissioners [128] at 9. Defendants Mr. Miller and Mr. Mitchell, individually, assert the qualified immunity defense.

The Fifth Circuit has already addressed the sufficiency of Mr. Johnson's First Amendment retaliation allegations. *Johnson v. Miller*, 126 F.4th 1020 (5th Cir. 2025). In reversing the Rule 12(c) dismissal, the appellate court held that the amended complaint related back to the original pleading because the facts alleged were sufficient to put Defendants on notice of the First Amendment claim. *Id.* at 1030. The appellate decision thus resolved only the statute-of-limitations and notice issues at the pleading state. The case now proceeds on a developed summary-judgment record, where the question is no longer whether the complaint stated a claim, but whether the evidence creates genuine disputes of material fact that preclude judgment as a matter of law on Johnson's allegations of First Amendment retaliation and whistleblower claim. The Court addresses each claim in turn.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is

"genuine" if a reasonable jury could return a verdict for the nonmoving party, and a fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022). In considering summary judgment, the court must draw all reasonable inferences in favor of the nonmovant and may not make credibility determinations or weigh evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the movant shows the absence of a genuine dispute of material fact, the burden shifts to the nonmovant to identify specific evidence demonstrating a triable issue. *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence will not suffice. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). If the nonmovant fails to meet this burden, summary judgment must be granted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

When a defendant asserts qualified immunity, the plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Although this is a demanding standard, it does not alter the Court's duty at summary judgment to view the evidence in the light most favorable to the non-movant. The Supreme Court emphasized in *Tolan v. Cotton*, that courts err when they "weigh the evidence" or resolve factual disputes in favor of the moving party. 572 U.S. 650, 656-57, (2014). Accordingly, even in the qualified immunity context, this Court must credit Mr. Johnson's version of disputed facts at the summary judgment stage and as a first step, determine "whether plaintiff alleged a violation of a clearly established constitutional right[.]" *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

### III.   DISCUSSION

#### A.  First Amendment Retaliation Claim

A plaintiff can establish a prima facie case under § 1983 by alleging: (1) a violation of a federal constitutional or statutory right, in this case, the First Amendment; and (2) that the violation was committed by an individual acting under the color of state law. *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). To meet the first prong, Mr. Johnson must show that "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Johnson*, 126 F.4th at 1029 (citing *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quotation omitted)).

#### a.  Adverse Employment Action

Mr. Johnson's suspension and termination are undisputed. Termination is the clearest form of adverse employment action. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." (citing *Pierce v. Texas Dep't of Crim. Just., Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994)); *see also Sharp v. City of Hous.*, 164 F.3d 923, 933 (5th Cir. 1999).

#### b.  Speech as a Citizen on a Matter of Public Concern

The parties dispute both whether Mr. Johnson spoke as a private citizen rather than pursuant to his official duties, and whether his speech addressed matters of public concern. The Court addresses each issue in turn.

#### 1.  Citizen Speech

The threshold question is whether Mr. Johnson spoke as a citizen rather than pursuant to his official duties when he called for his reinstatement, termination of the commissioners, and reported

the alleged inefficiency and incompetency. This Court previously held that Mr. Johnson spoke as a citizen when he reported concerns to city officials and state agencies. *Johnson v. Clarksdale Pub. Utilities Comm'n*, No. 4:21-CV-120, 2023 WL 2598690, *5 (N.D. Miss. Mar. 22, 2023). Under Fifth Circuit precedent, when an employee "takes his job concerns to persons outside the workplace in addition to raising them up the chain of command," those communications are ordinarily made as a citizen, not as an employee. *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008).

Defendants argue Mr. Johnson's reports to the Mayor, City Council, and the press were made pursuant to his duties as General Manger. [128] at 16-18. They rely on *Garcetti v. Ceballos*, 547 U.S. 410, 126 (2006), and *Walker v. Smith*, 801 F. App'x 265 (5th Cir. 2020), where external reporting was deemed an extension of internal job responsibilities. Defendants argue the same reasoning applies here because Mr. Johnson was directed to investigate the telephone system and initially sought permission from the Board before contacting state officials and the press, which they characterize as evidence that he viewed those reports as within his official responsibilities and up-the-chain reporting. [128] at 17-18; [127], Exs. 10, 18.

Defendants further argue that to the extent Mr. Johnson raised broader allegations, those statements reflected personal employment grievances rather than matters of public concern. They point to Mr. Johnson's attachment to a letter seeking reinstatement and urging the removal of the entire CPU Board of commissioners, in which he listed fifteen areas of alleged "inefficiency and incompetency". [127], Ex. 26. These  included assertions that Mr. Miller asked him to cooperate in firing CFO Steve Reed, that Board members and the Board attorney met privately to discuss the phone recording issue, that a CPUC meeting and press release "degrade[d]" his character, and that commissioners made inappropriate personnel and financial decisions, such as failing to review the

Board attorney's invoices and using an iPad for official work, among others. [128] at 7-8; *see also Warnock v. Pecos Cnty. Tex.*, 116 F.3d 776, 780 (5th Cir. 1997) (finding that a public employee's personal concern for "working conditions, job security, and the like" are not matters of public concern).

Mr. Johnson responds that neither his job description nor the governing statute, Miss. Code Ann. § 21-27-17, authorized him to report misconduct externally. [139] at 18. According to Mr. Johnson, the statute vests all reporting authority in the CPUC itself, leaving the General Manager with ministerial duties and that in fact, CPUC hired a public relations employee, Mr. Campos, whose job was to interact with the press. *Id.* at 19. Unlike the plaintiff in *Walker* whose supervisor authorized her to report the bad checks to the Mississippi Bureau of Investigation, the Board here denied Mr. Johnson's request to report the telephone matter. 801 F. App'x at 268. He contacted the city attorney and State Auditor anyway and characterizes this as whistleblowing outside the scope of his employment. [139] at 19-20. He further notes that CPUC is an independent entity, not subordinate to city officials, and that his repeated communications with the Mayor, City Council, and the press cannot be construed as "up-the-chain" of command reporting. [139] at 20; *see Davis*, 518 F.3d at 313.

Mr. Johnson's job description and the governing statute indicate that his responsibilities did not include reporting to outside authorities. His communications exceeded that defined role when he spoke directly to the press, urged removal of the CPU commissioners, and contacted external authorities after the Board denied his request for permission. Precedent recognizes that speech "made 'externally' concerning 'an event that was not within [his or her] job requirements' was

entitled to First Amendment protection." *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016)[2]. CPUC's own lawsuit against the City, filed in response to Mr. Johnson's communications, further confirms that his speech reached outside the chain of command and was perceived as beyond his official duties [144], Ex. 9. Thus, viewing the evidence in the light most favorable to Mr. Johnson, the record supports a reasonable inference that his external communications to the State Auditor and the press fell outside his official duties. Accordingly, the Court concludes that Mr. Johnson spoke as a citizen.

### 2. Public Concern: Content, Context, and Form

Assuming, for purposes of summary judgment, that Mr. Johnson spoke as a citizen rather than as an employee, the Court must next decide whether the content of his speech addressed a matter of public concern. This is a legal question for the Court. *See Marceaux v. Lafayette City-Par. Consol. Gov't*, 921 F. Supp. 2d 605, 634 (W.D. La. 2013) (citing *Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir. 1991)). Speech involves public concern if it "relat[es] to any matter of political, social, or other concern to the community." *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001). Reports of corruption or misuse of public resources "almost always" meet this standard. *Johnson*, 126 F.4th at 1029 (citing *Charles*, 522 F.3d at 514 (collecting cases)).

The content of Mr. Johnson's statements included two central demands: reinstatement as General Manager and removal of all CPU commissioners [127] Ex. 26 at 1, as well as fifteen allegations of extortion, abuse of power to advance sexual favors, misuse of public funds by commissioners and CPU's attorney, unauthorized telephone recordings, among others. *Id.* at 5-11;

---

[2] (citing to *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472-73 (5th Cir. 2014) (holding that by 2010, the combination of *Garcetti*, *Davis*, *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689 (5th Cir. 2007), and *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008), had clearly established the law)).

[139] at 23. Clearly, these topics of "malfeasance" extend beyond personal employment disputes and touch on issues of public concern in the management of a municipally owned utility. *See Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990) (quoting *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1998) (per curiam) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matter of public import.")).

However, context and form matter. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Thompson*, 901 F.2d at 461. The Fifth Circuit has recognized that even speech touching on public issues may fall outside protection where the circumstances show that personal employment motives predominated. *Gibson v. Kilpatrick*, 838 F.3d 476, 486-87 (5th Cir. 2016). "Speech is made in the context of a matter of public concern when it occurs 'against a backdrop of widespread debate in the community' rather than when it is 'made solely in furtherance of a personal employer-employee dispute.'" *Muslow v. Bd. of Supervisors of Louisiana State Univ.*, 2020 WL 4471647, at *22 (E.D. La. Aug. 4, 2020) (quoting *Gibson*, at 487. The Fifth Circuit has also recognized so-called "mixed speech" cases, in which an employee's statements contain both personal and public elements. *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005). In such cases, courts nevertheless examine whether the speech, taken as a whole, addresses matters of public concern. *Id.* Courts evaluating mixed speech consider content, context, and form together, but "weigh context and form 'more heavily.'" *Muslow*, 2020 WL 4471647, at *22 (citing *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999)). The present record shows mixed speech: Mr. Johnson raised issues of public significance while also advancing his personal interest in reinstatement and contract renewal.

9

The chronology here is critical. On May 30, 2018, the Board discovered the unauthorized telephone recording system and directed Mr. Johnson, as General Manager, to investigate. [127], Ex. 9. On June 21, Mr. Johnson emailed CPUC seeking a three-year contract offer for himself, for Mr. Reed and for Mr. Campos, who were involved in purchasing and approving the recording system. [127], Exs. 10, 12. On July 3, he advised taking it "slow and deliberate[ly]" with reporting to law enforcement and suggested hiring a private investigator. [127], Ex. 11. Later that day, the Board attorney informed Mr. Johnson that the FBI had been notified, after which he began researching case law on how to claim wrongful termination and defamation. [127] Exs. 33, 36 at 6. Through most of July, he addressed concerns internally in his capacity as the General Manager, to the Board, urged it to investigate allegations unrelated to the telephone recording system, and pressed an employee to raise sexual allegations against a commissioner. [127], Exs. 17, 22.

By late July, Mr. Johnson spoke at City Commissioner meetings and to the press despite the ongoing independent investigation. On July 24, the subordinate employee who presumably brought up the sexual allegations months earlier, stated in an affidavit that she had been "used as a weapon" by Mr. Johnson to "assassinate the character of Donald Mitchell." [127], Ex. 22. That same day, Mr. Johnson emailed CPUC and the city attorney about providing documents to the State Auditor and Attorney General. [144], Ex. 3. He was suspended with pay on July 25. [144], Ex. 5 at 2. After suspension, he circulated fifteen allegations of inefficiency and incompetency and demanded: (1) reinstatement for himself, Mr. Reed, and Mr. Campos, and (2) removal of the entire CPU Board of commissioners. [127], Ex. 26.

Defendants argue, in context, this sequence shows that personal employment concerns predominated. They note that Mr. Johnson prioritized contract renewal, delayed certain allegations until FBI involvement became unavoidable, and raised external reporting only after disciplinary

consequences became imminent. They characterize Mr. Johnson's complaints as internal grievances and managerial disputes that "do not go beyond a 'personal employer-employee dispute[.]'" [128] at 19 (citing *Sagle v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2006)).

Defendants also argue that several of Mr. Johnson's communications with the CPUC were framed as internal managerial recommendations signed as "the General Manager," requesting commissioners "investigate this matter and resolve it" and "determine if [the Board] is obligated to inform law enforcement in the interest of employee and public safety." [127], Ex. 17. In their view, the clustering of allegations and simultaneous demand for reinstatement resemble the circumstances in *Gibson*, where the plaintiff's speech in a private lawsuit reflected mixed concerns but was driven primarily by a desire for personal relief and damages. 838 F.3d at 487.

Mr. Johnson, however, points to the content and substance of his reports, including allegations of extortion, abuse of power, misuse of public funds, among others. [139] at 23-24. He notes that his complaints drew attention from city officials and the press, underscoring their public significance. [144], Ex. 20. Mr. Johnson argues that addressing elected officials in open meetings attended by members of the public, and speaking directly with the press, are quintessential forms of citizen speech entitled to First Amendment protection. *E.g. Salge*, 411 F.3d at 191-92. He points to press coverage describing "great public interest" in CPUC's governance as evidence that his speech occurred against "a vigorous backdrop of 'public debate.'" [139] at 22.

In the Fifth Circuit's view, "even a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as mixed speech." *Gibson*, 838 F.3d at 485; *Teague*, 179 F.3d at 382. Thus, the Court acknowledges the mixed character of Mr. Johnson's speech. Like the plaintiff in *Gibson* who sought personal relief, Mr. Johnson's actions to renew his employment contract, requesting reinstatement, and researching how to claim wrongful termination and

11

defamation, suggest that his speech was aimed at securing his position. *Gibson*, at 485. These facts support Defendants' argument that private concerns predominated.

However, important distinctions exist. Unlike *Gibson*, where the plaintiff's speech took the form of a private lawsuit and was not communicated to state authorities or the public, Mr. Johnson brought his allegations to the press, addressed them at public meetings, and raised the possibility of reporting the telephone recording matter to the Attorney General and State Auditor. In this respect, his speech resembles public whistleblowing rather than a "personal employer-employee dispute." *Sagle*, 411 F.3d at 187-88.

The Court recognizes that determining Mr. Johnson's precise motives may involve factual disputes. However, the ultimate question of whether his speech, viewed in context, addressed a matter of public concern, is a legal determination for the court. *Marceaux*, 921 F. Supp. 2d at 634 (citing *Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir. 1991)). At summary judgment, the Court must draw all reasonable inferences in Mr. Johnson's favor. *Reeves*, 530 U.S. at 150. Viewing the content, form, and context of his speech in the most favorable light, there is more than a scintilla of evidence that at least part of Mr. Johnson's communications addressed matters of public concern. The substantive allegations of waste of funds, abuse of power, and illegal conduct in the management of a public utility, coupled with his decision to address those concerns through public channels, and call for the removal of the Board, place his speech within the scope of First Amendment protection. Accordingly, the Court concludes that Mr. Johnson's speech addressed a matter of public concern. Having resolved the public concern inquiry, the Court turns to the next element, the *Pickering-Connick* balancing test.

### c. Pickering-Connick Balancing Test

Even if Mr. Johnson spoke as a citizen on a matter of public concern, "he m[ay] lack constitutional protection for such statements, if they tend to unduly harm the efficient operations of the government defendant." *Samsel v. Desoto Cnty. Sch. Dist.*, 242 F. Supp. 3d 496, 515 (N.D. Miss. 2017) (citing to *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731 (1968); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684 (1983)). The Court must weigh Mr. Johnson's interest in speaking against CPUC's interest in providing efficient service. The balancing test is a question of law that focuses on whether the speech generated disruption sufficient to impede operations or destroy necessary working relationships. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 223 (5th Cir. 1999).

Courts consider five factors: "(1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employer's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; [and] (5) whether the activity impairs discipline by superiors or harmony among coworkers." *Jordan v. Ector Cnty.*, 516 F.3d 290, 299 (5th Cir. 2008).

The Court has already addressed factors (1) and (2), finding that Mr. Johnson's speech involved matters of public concern and that his communications, while initially internal, later extended to public forums including press and government officials. The Court now expands briefly on the second factor, i.e. time, place, and manner of the employee's activity, because that inquiry overlaps with the chronological analysis discussed above in the public concern determination. As the record reflects, the manner and timing of Mr. Johnson's speech are central

to evaluating its impact. Defendants bear the burden of "'establish[ing] that the government's interest in promoting the efficiency of the services provided by its employees outweighs [Mr. Johnson's] interest in engaging in the protected activity.'" *Garza v. Escobar*, 972 F.3d 721, 729 (5th Cir. 2020) (quoting *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995)). This balancing operates on a sliding scale: "'public concern' is weighed against disruption." *Id.* "The ultimate issue thus requires balancing of the [employee's] First Amendment right to participate in protected activity against the legitimate needs of the employer to provide efficient public service," and "the balancing test is case-specific." *Garza*, 972 F.3d at 729 (citing *Maldonado v. City of Altus*, 932 F.3d 388, 392 (5th Cir. 2019)).

Consistent with this Court's prior reasoning in *Samsel v. Desoto County School District*, 242 F. Supp. 3d at 518, the Court proceeds with caution in granting constitutional protection to "First Amendment activity by employees who believe that their job is threatened." As *Samsel* observed, absent such caution, threatened employees might be encouraged "to 'lash out' against their employers by making statements of alleged public interest" to manufacture potential retaliation claims and save their jobs. *Id.* The record here presents precisely this concern. The time and manner of Mr. Johnson's communications reveal that his actions shifted toward professional self-preservation once discipline became imminent. After being directed to investigate the telephone recordings, he sought a contract renewal, solicited false allegations against a commissioner, and began contacting city officials only when disciplinary action loomed. Following his suspension, Mr. Johnson's public campaign demanding reinstatement and removal of the commissioners further strained internal relationships and undermined CPUC's operational harmony.

This chronology informs the remaining *Pickering-Connick* factors: (3) whether Mr. Johnson's speech undermined essential working relationships, (4) whether it was hostile or insubordinate,

and (5) whether it impaired workplace discipline and harmony. From the Court's perspective, Mr. Johnson's speech, even assuming it touched on matters of public concern, was primarily driven by private motives and contributed to a breakdown of trust and cooperation within CPUC. *See Teague*, 179 F.3d at 381-83 (holding that a "scintilla" of public concern does not transform a private employment matter into a matter of public concern).

Defendants maintain that Mr. Johnson's conduct undermined essential working relationships, amounted to insubordination, and disrupted CPUC's operations. They emphasize that the General Manager occupies a leadership position and must maintain a working relationship with the commissioners on the Board to ensure uninterrupted public utility service. [128] at 21. By engaging external officials and the press with allegations against the commissioners while an internal investigation was ongoing, Mr. Johnson eroded those relationships and created confusion within CPUC's organizational structure. *Id.* at 22 (citing *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 390 (2011) (finding that speech that is directed at or concerning other public employees could have serious and detrimental effect on morale)). Mr. Johnson's call for the commissioners' removal and his public criticism of CPUC leadership reflect conduct reasonably predicted to cause disruption, if not actual disruption, within the CPU. *See Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 741 (5th Cir. 2015) (citing *Connick*, 461 U.S. at 151, 103 S.Ct. 1684, to show the statements at issue therein caused what the employer characterized as a "mini-insurrection," thus establishing actual disruption.).

Defendants also allege that Mr. Johnson's conduct prior to suspension was hostile and insubordinate and impaired the harmony among coworkers. They point to the affidavit of a subordinate employee who stated that Mr. Johnson used her as a "ploy" in a scheme against a commissioner, leaving her "emotionally and physically tired[,] … mentally drained" and

15

distrustful of leadership. [127] Ex. 22 at 3. They further note that Mr. Johnson's actions precipitated litigation between CPUC and the City of Clarksdale, diverting public resources and attention away from utility operations. Defendants argue that the absence of any resulting investigation or enforcement action by the State Auditor or other authorities demonstrates that the public "value of Johnson's speech is nil" when weighed against the disruption it caused. [128] at 22.

Mr. Johnson responds that "any disruption was purely Defendants' fault[,]" asserting that "[i]f they had done their own duty and reported the issues [he] wished to report to the proper authorities when he first asked them to, then no other 'disruption' would have occurred." [139] at 24 (emphasis in original). He maintains that CPUC's hostility arose only after he attempted to expose misconduct, and that his speech should not lose constitutional protection merely because it provoked anger or discomfort. [139] at 24. Yet Mr. Johnson does not dispute that actual disruption occurred. While he attributes fault to CPUC, the *Pickering-Connick* analysis does not turn on which party is to blame, but on whether the employer had "an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.

Here, the undisputed record demonstrates substantial disruption in CPUC's operation. Indeed, while courts do not require "actual disruption" since "reasonable prediction of disruption" suffices, the undisputed existence of actual disruption here strengthens Defendants' position considerably. *Graziosi*, 775 F.3d at 741 (citations omitted). Mr. Johnson's conduct led to multiple suspensions, strained employee morale, and compelled CPUC to file suit against the City to reassert its authority. His campaign to remove the entire CPU Board of commissioners and his public accusations against individual commissioners fractured essential working relationships and impaired discipline within CPUC. In light of his leadership role, the Court concludes that the

16

employer's interest in preserving operational stability and trust among its governing body outweighs whatever public interest Mr. Johnson's speech may have served. Accordingly, factors (3) through (5) collectively weigh in favor of Defendants, and the *Pickering-Connick* balancing test resolves as a matter of law for the employer.

### d.  Causation and Majority Animus

Even assuming the *Pickering-Connick* balancing test favored Mr. Johnson's speech, his First Amendment claim independently fails for lack of causation. The fourth element requires proof that the protected speech was a substantial or motivating factor in the adverse action. *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001). Even if retaliatory motive exists, a plaintiff is required to show the motive was the but-for cause, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th Cir. 2024) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)).

Defendants argue that Mr. Johnson cannot meet this burden because the commissioners acted on the findings of Mr. Herring's independent investigation rather than in retaliation for his speech. The Board formally adopted Mr. Herring's "Findings of Fact and Conclusions," which identified, among other things, that Mr. Johnson and his management team were responsible for violations of law and CPUC policy, misconduct, and acts of insubordination. [127] Exs. 34 at 2, 36. Defendants further emphasize that Commissioners Miller and Mitchell testified they were unaware of Mr. Johnson's intent to contact the State Auditor at the time of his suspension and termination. *Id.* Because the Board voted three to one, with one abstention, Defendants argue that Mr. Johnson cannot meet his burden under *Griggs v. Chickasaw Cnty. Miss.*, 930 F.3d 696, 704 (5th Cir. 2019), which requires evidence that a majority of decisionmakers acted with retaliatory motive.

Finally, Defendants maintain that even if some animus existed, CPUC would have terminated Mr. Johnson for legitimate, non-retaliatory reasons including his managerial role in authorizing the illegal telephone recording system and failing to notify CPU employees they were being recorded, violating purchasing laws, attempting to manipulate the investigation, and coercing a subordinate employee to file a false sexual harassment statement against a commissioner. [127] Ex. 5 at 15-30; [148] at 9. Under Fifth Circuit precedent, Mr. Johnson was required to put forth evidence rebutting each of the non-retaliatory reasons offered. *E.g. Clark v. City of Alexandria*, 116 F.4th 472, 483 (5th Cir. 2024) (ruling that the plaintiff failed to establish pretext by rebutting the employer's nonretaliatory reasons).

Mr. Johnson responds that genuine issues of material fact preclude summary judgment. He points to his July 24, 2018 email to all commissioners titled "State Auditor," announcing his intent to report "abuse of power" and "irregular matters." [144] Ex. 3. He emphasizes that his suspension followed the next day and that his termination letter referred to his external communications as "insubordination." [127] Ex. 36 at 1. Mr. Johnson also relies on CPUC's subsequent lawsuit against the City as evidence that the Board perceived his speech as a challenge to its authority. He argues that this sequence of events creates a plausible inference of retaliatory motive and that credibility issues should be reserved for the jury. *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013) ("The causal connection prong, for example, may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may be plausibly inferred.") (citing *Brady v. Hous. Indep. Sch. Dist.,* 113 F.3d 1419, 1424 (5th Cir.1997)).

The Court recognizes that the causation element in First Amendment retaliation cases often presents factual disputes not well suited for summary disposition. *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) ("Summary judgment should be used 'most sparingly in ... First

Amendment case[s] ... involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities.'") (quoting *Porter v. Califano*, 592 F.2d 770, 778 (5th Cir. 1979)); *see also Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 193 (5th Cir.1988) and *Click v. Copeland*, 970 F.2d 106, 113-14 (5th Cir. 1992) (finding that summary disposition of the causation issue is generally inappropriate because a defendant's motive is a question of fact.). Nevertheless, summary judgment is appropriate where the plaintiff fails to produce evidence controverting the employer's legitimate reasons for termination. *Pierce*, 37 F.3d at 1150; *Beattie*, 254 F.3d at 604-5. Here, Defendants produced substantial evidence that the Board acted on an independent report documenting multiple violations of law and policy, including improper expenditures, coercion of an employee, and mismanagement of infrastructure projects. [127] Ex. 5. The record shows that the Board formally and unanimously adopted those findings before voting to terminate Mr. Johnson.

Although Mr. Johnson offers temporal proximity and limited circumstantial evidence of animus, such as the July 24 email, this evidence at most raises a credibility question as to whether Mr. Miller and Mr. Mitchell reviewed or disregarded the message before voting. That narrow dispute does not establish causation. Even if a reasonable jury could find that one or both commissioners harbored retaliatory motive, such individual animus cannot be imputed to the Board as a whole. The Fifth Circuit made clear in *Griggs*, that even where there is evidence of retaliatory animus by individual board members, "the dispositive question is simply whether retaliatory animus is also chargeable to the Board itself." 930 F.3d at 704 (quoting *Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016)). Other circuits likewise apply the "majority-motivation approach," requiring proof that a majority of the multimember body acted with retaliatory animus before such motive can be imputed to the entity. *See*, *e.g.*, *Campbell v. Rainbow City, Ala.*, 434

F.3d 1306 (11th Cir. 2006); *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003); *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994).

In *Griggs*, the Fifth Circuit upheld a jury verdict because the evidence, when viewed in the light most favorable to the plaintiff, showed that at least three of the five board members shared a retaliatory motive, enough to constitute a majority. *Id.* at 705. Here, by contrast, the record contains no evidence regarding Commissioner Hicks, the third and deciding vote, or any indication that he acted with retaliatory motive. Absent such proof, Mr. Johnson cannot demonstrate that a majority of the CPUC acted with retaliatory motive. Even drawing all inferences in his favor and assuming a factual dispute exists as to Mr. Miller and Mr. Mitchell's motives, two is not enough to constitute a majority of a five-member board.

Accordingly, while credibility issues may exist as to individual commissioners, the absence of evidence that a majority of decisionmakers acted with retaliatory motive is fatal to Mr. Johnson's causation showing. Moreover, Defendants have presented unrebutted, legitimate reasons for termination supported by contemporaneous documentation. Mr. Johnson offers no competent evidence rebutting those justifications and no evidence relating to the additional Board members. *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."). For these reasons, the Court concludes that Mr. Johnson has not created a genuine dispute of material fact on causation or majority animus. Defendants are therefore entitled to judgment as a matter of law on this element, and Mr. Johnson's First Amendment retaliation claims must be dismissed in its entirety.

## B. Qualified Immunity

Having found that Mr. Johnson failed to establish causation, the Court nevertheless addresses the qualified-immunity defense to clarify the governing law. "The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. Cnty. of Comal,* 400 F.3d 284, 289 (5th Cir. 2005).

Courts apply a two-step inquiry to determine whether qualified immunity applies: "[t]he first step is to determine whether plaintiff alleged a violation of a clearly established constitutional right" and "[t]he second step requires determining whether ... the official's conduct was *objectively* reasonable under clearly established law existing *at the time of the incident*." *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir.2001) (emphasis in original)). The Court has discretion to decide which prong to address first. *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018).

Defendants Mr. Miller and Mr. Mitchell assert that they are entitled to qualified immunity because, in 2018, the law was unsettled regarding the personal liability of individual members of a multi-member board. They rely on *Sims* and *Griggs*, which together left the scope of such liability uncertain. Mr. Johnson responds that the First Amendment protection for external reporting was clearly established under *Davis*, *Lane*, *Howell*, *Anderson*, and *Salge*[3], and that a reasonable official would have known that retaliation for such speech was unlawful.

---

[3] *Davis*, 518 F.3d 304; *Lane v. Franks*, 573 U.S. 228 (2014); *Howell*, 827 F.3d 515; *Anderson*, 845 F.3d 580; and *Salge*, 411 F.3d 178.

## 1. Constitutional Violation

Under *Sims*, public officials who lack final decisionmaking authority may nonetheless incur personal liability under § 1983 if their retaliatory animus is a "but-for" causal link in the chain leading to the adverse employment action. 894 F.3d at 641 (citing *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986)). Thus, the threshold question is whether the summary judgment record, viewed in Mr. Johnson's favor, would permit a reasonable jury to find that Mr. Miller's or Mr. Mitchell's alleged retaliatory conduct was the but-for cause of his termination.

The record does not support such a finding. As explained above, Defendants produced substantial contemporaneous evidence that the Board acted on the findings of an independent investigation documenting multiple violations of law and CPU policy, including improper purchases, coercion of a subordinate employee, and insubordination. [127] Ex. 5 at 15-30. These findings provided legitimate, non-retaliatory grounds for termination. To survive summary judgment, Mr. Johnson was required to produce competent evidence rebutting those grounds and showing that retaliation was the but-for cause of his termination. *Sims*, 894 F.3d at 641; *Degenhardt*, 117 F.4th at 758. He did not. Mr. Johnson relies primarily on the temporal proximity between his July 24, 2018 email and his suspension, and on circumstantial inferences of hostility. Such evidence, without proof controverting the Board's stated basis for termination, is insufficient to create a triable issue of fact. Having failed to demonstrate that his protected speech was the but-for cause of his termination, Mr. Johnson has not established a constitutional violation by either Mr. Miller or Mr. Mitchell.

## 2. Clearly Established Law

Even assuming a factual dispute exists regarding motive, Mr. Miller and Mr. Mitchell are nonetheless entitled to qualified immunity because the law in September 2018 did not clearly

establish the individual liability of commissioners serving on a multi-member board. Prior to *Sims*, Fifth Circuit precedent, most notably *Johnson v. Louisiana*, 369 F.3d 826 (5th Cir. 2004), categorically barred liability for officials who were not final decisionmakers. *Sims*, 894 F.3d at 64, decided June 28, 2018, abrogated that rule and held that non-final decisionmakers may be liable if their retaliatory animus was a causal link in the chain of events. But *Sims* did not define how that principle applies where a multi-member body acts collectively, nor did it address whether a single member's alleged animus can establish personal liability absent proof that his influence or vote was outcome-determinative.

Given that ambiguity, a reasonable commissioner in 2018 could have believed that participating in a collective majority vote based on an independent investigation did not expose him to personal liability under § 1983. The absence of clearly controlling precedent on this point indicates that the law was not "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017); *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). The Fifth Circuit has not yet clarified how *Sims* aligns with *Griggs*, particularly regarding whether animus from fewer than a majority of a board may be attributed to the board itself. *Griggs*, 930 F.3d at 704; *Howell*, 827 F.3d at 527.

The case law cited by Mr. Johnson does not alter this conclusion. As pointed out in the Defendants' briefing *Davis*, 518 F.3d at 317, *Lane*, 573 U.S. at 234, and *Anderson*, 845 F.3d at 586, each involved individual, final decisionmakers and not members of a collective board. In *Howell*, the Fifth Circuit in fact affirmed dismissal of individual board members on qualified immunity grounds because they were not final decisionmakers. 827 F.3d at 526. And in *Salge*, the court addressed only employer liability and did not consider qualified immunity for individual defendants. 411 F.3d at 182. The Court agrees that none of these cases clearly establish "beyond

debate" that individual commissioners serving on a multi-member board could be held personally liable for the collective decision of the board.

Accordingly, even if the evidence permitted an inference of retaliatory motive, the law at the time did not clearly establish "beyond debate" that Mr. Miller and Mr. Mitchell's "particularized actions" violated the Constitution. *White*, 580 U.S. at 79; *see also Mullenix*, 577 U.S., at 12, 136 S.Ct. at 552. The Court concludes that a reasonable commissioner could have believed that voting to terminate a general manager based on an independent investigation was lawful. Mr. Miller and Mr. Mitchell are therefore entitled to qualified immunity and summary judgment.

## C. Mississippi Whistleblower Protection Act Claim

Mr. Johnson asserts a claim under the Mississippi Whistleblower Protection Act ("MWPA"), alleging that CPUC terminated him for reporting inefficiency and misconduct to the State Auditor. In answering a certified question in this present case, the Mississippi Supreme Court held that the MWPA "prohibits a governmental employer from taking any 'reprisal or retaliatory action' against a governmental employee (whistleblower) 'who in good faith reports an alleged improper governmental action to a state investigative body, initiating an investigation.'" *Johnson v. Miller*, 396 So. 3d 1137, 1140 (Miss. 2024) (quoting Miss. Code Ann. § 25-9-171(j)). The statute defines a "whistleblower" as:

> [A]n employee who in good faith reports an alleged improper governmental action to a state investigative body, initiating an investigation. For purposes of the provisions of Section 25-9-171 through 25-9-177, the term "whistleblower" also means an employee who in good faith provides information to a state investigative body, or an employee who is believed to have reported alleged improper governmental action to a state investigative body or to have provided information to a state investigative body but who, in fact, has not reported such action or provided such information.

> Miss. Code Ann. § 25-9-171(j).

Defendants argue that Mr. Johnson cannot establish causation because the Board acted on investigator Mr. Herring's report rather than his reporting activity, and that a majority of the Board lacked retaliatory motive. [128] at 25-26. Mr. Johnson responds that his July 24 email to commissioners expressly announced his intent to contact the State Auditor, that he was suspended the following day, and that his termination notice cited his reporting as "insubordination." [144] Ex. 3; [127] Ex. 36 at 1.

As discussed above, the Court acknowledges the sequence of events may create a factual dispute regarding Mr. Miller and Mr. Mitchell's knowledge or motive. Nevertheless, Mr. Johnson has not rebutted each of the legitimate, non-retaliatory grounds for termination identified in Mr. Herring's independent investigation report. [127] Ex. 5. Under the MWPA, an employee may not recover "unless the dismissal or adverse action taken against him was the direct result of providing information to a state investigative body." Miss. Code Ann. § 25-9-173(3).

For the reasons discussed above, the Court finds that Mr. Johnson has not produced evidence showing that his termination directly resulted from his communications with the State Auditor. The record instead supports the conclusion that CPUC acted on the independent investigative findings. Accordingly, he cannot satisfy the causation element required under the MWPA, and Defendants are entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, it is ordered that Defendants' Motion for Summary Judgment [127] is GRANTED and Plaintiff's Motion for Partial Summary Judgment [125] is DENIED as moot.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

SO ORDERED, this the 20th day of October, 2025.

   /s/Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI